**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **SHAN FIELDMAN,** | ) | |
| **No. M-23832,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15-cv-1389-NJR** |
| | ) | |
| **KIM BUTLER,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Following a May 2011 jury trial in Livingston County, Illinois, Petitioner Shan Fieldman was convicted of two counts of solicitation of murder for hire, one for Shelley Fieldman, his ex-wife, and the other for Alan Chrossfield, her boyfriend. *People v. Fieldman*, No. 10-CF-199 (Livingston Cnty. Cir. Ct.). He was sentenced to concurrent terms of 36 years' imprisonment and remains in the custody of the Illinois Department of Corrections.

On December 21, 2015, Fieldman, who is represented by counsel, filed a Petition for Writ of Habeas Corpus in this Court pursuant to 28 U.S.C. § 2254. (Doc. 1). At that time, Fieldman was incarcerated at Menard Correctional Center, where Respondent Butler was the warden.

Fieldman claims that his constitutional right to present a defense, as secured by the Due Process Clause of the Fourteenth Amendment, was denied when the trial court excluded his testimony regarding interactions he had with the confidential informant (Trina Bennett) who introduced him to a hit man. The supposed hit man was in truth an undercover police sergeant.

---

[1] According to the public information posted on the website of the Illinois Department of Corrections, Fieldman is no longer housed at Menard, and is currently in Hill Correctional Center. Https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (last visited March 25, 2019). The Clerk shall be directed to make the appropriate substitution of the Respondent.

Fieldman argues that the exclusion of his testimony about several conversations with Bennett—in which she described having committed murder, initiated the idea of having Fieldman's ex-wife killed in exchange for money, offered to kill the ex-wife herself, and pressured Fieldman for money, as well as his belief that Bennett broke into his home—deprived him of his fundamental due process right to present his defense on the essential element of his intent. Without this background testimony, Fieldman was not allowed to explain his fear of Bennett, which eventually led him to agree to the meeting with the "hit man" that Bennett had set up—even though he never intended to have the murders carried out. (Doc. 1, p. 7).

Fieldman seeks a writ of habeas corpus discharging him from his confinement and relieving him of his conviction and sentence. (Docs. 1, 2, and 20). Respondent opposes issuance of the writ, countering that the trial court properly excluded Fieldman's proffered testimony regarding Bennett on the basis of relevance. (Doc. 15).

For the reasons discussed below, the Court grants the habeas petition.

**RELEVANT FACTS AND PROCEDURAL HISTORY**

**1.      Overview**

This summary of the facts is derived from the description by the Appellate Court of Illinois, Fourth District, in its Rule 23 Order affirming Fieldman's conviction on direct appeal. (Doc. 1-1; Doc. 16-1). The state court's factual findings are presumed to be correct unless rebutted by clear and convincing evidence; Fieldman has raised no dispute as to the facts. 28 U.S.C. § 2254(e).

In the summer of 2010, Trina Bennett, a confidential informant, advised Illinois State Police special agent Darrell Stafford that Fieldman was interested in hiring someone to murder his ex-wife, Shelley Fieldman. Stafford obtained a court order authorizing him to record Fieldman's telephone conversations. On July 22 and 23, 2010, Stafford made audio recordings of telephone

conversations between Bennett and Fieldman. In those recorded conversations, Bennett arranged a meeting between Fieldman and Earl Candler, an undercover police sergeant posing as a "hit man."

On the evening of Friday, July 23, 2010, pursuant to the arrangements Bennett made with Fieldman over the phone, Candler met with Fieldman in the parking lot of the Walmart in Pontiac, Illinois. The meeting took place inside Candler's truck, which had been equipped with audio and video recording devices. Fieldman told Candler that he wanted Shelley killed, stating further that if Shelley's boyfriend, Alan Chrossfield, was present when Candler encountered Shelley, Candler should kill him too.

Fieldman agreed to pay Candler $7,500 to kill both Shelley and Chrossfield. Fieldman left Candler's vehicle and returned with $100 for a down payment. Pursuant to Candler's request, Fieldman wrote on a piece of paper, "I.O.U $7,400 at the completion of the job." Candler told Fieldman that this would be their final interaction and that, by the same time next week, Shelley— and possibly Chrossfield—would be dead.

Police maintained surveillance of Fieldman following the meeting with Candler. Later in the evening, police arrested him during a traffic stop.

The State charged Fieldman with one count of solicitation of murder for hire (720 ILCS 5/8–1.2(a) (West 2010)) as to Shelley. In August 2010, the State amended the information, adding an additional count of solicitation of murder for hire as to Chrossfield. Fieldman did not file any pretrial motions to suppress.

In May 2011, following a two-day trial, the jury convicted Fieldman on both counts. In September 2011, the trial court sentenced Fieldman to concurrent terms of 36 years' imprisonment.

2.    **State Trial Proceedings**

During the State's case in chief, State Police Officer Stafford testified regarding the recorded telephone calls made on July 22 and 23, 2010, all initiated by Trina Bennett to Fieldman. (R. 167-73, 176-82; Doc. 16-13, pp. 190-205).[2] The audio recordings were played for the jury. (Exhibit C; Doc. 2-52). On July 22, 2010, Bennett attempted two calls to Fieldman, once leaving him a voicemail message for him to call her.

On Friday, July 23, 2010, she left another voicemail message for Fieldman to call her, saying she was in Pontiac. At around 12:40 p.m. that day, Fieldman's girlfriend Talia answered Bennett's call, then put Fieldman on the phone. Bennett said her contact suggested they meet in the Walmart parking lot, and he wanted to know if Fieldman was serious. Fieldman said he would not back out. At 5:16 p.m,, Bennett called Fieldman again and left a message for him to call back. At 5:51 p.m., Bennett called him again and Fieldman answered. Bennett told him the guy would be there at about 7:00 p.m. (Exhibit C).

Sergeant Candler testified about his July 23, 2010, meeting with Fieldman. (R. 239-52; Doc. 16-13, pp. 263-76). The video/audio recording of their meeting was played for the jury. (R. 252-55; Exhibits D and E, Docs. 2-53, 2-54). The video depicted Fieldman in the passenger seat of Candler's truck. Candler asked Fieldman for a photograph of Shelley Fieldman. Fieldman did not have one, but told Candler that he could find a picture of her on her Facebook account, which was under Shelley Bryant, her maiden name. Fieldman described Shelley's appearance, and her house and car, and did the same regarding her boyfriend Alan Chrossfield. Candler asked whether Fieldman wanted Alan killed also; he said yes, if Alan is there. Fieldman said that Shelley

---

[2] The trial transcript/report of proceedings was filed by Fieldman as Exhibit B, located at Docs. 2-22 through 2-51. Respondent filed the same document as Exhibit L, located at Doc. 16-13. Citations to the transcript will be to the original pagination of the transcript "R. __," as it was cited in the parties' briefing. Occasional references to the electronic file-stamped page numbers in Doc. 16-13 shall be included.

and Alan spend a lot of time out in the garage drinking, while the kids are inside the house.

Fieldman commented that because Shelley works from home babysitting, it was going to be hard to make it look like an accident. He wondered if it might be better to do it when the kids were with him, what would happen if the kids find them in the morning; but either way there's going to be trauma and it might "look better" if the kids were there.

Candler told him that once they left, Fieldman would never see him again—"it's done." Sometime between Tuesday and this time next week, his "problem would be gone." They agreed on a price of $7,500 for both, but $4,500 if just one person was killed. Fieldman had no money on him, so he had to get some from his girlfriend's purse for a down payment. He would need two weeks to get the rest. Fieldman called his girlfriend using Candler's phone, then left for a time.

Fieldman returned with $100. Candler had him write an IOU for the remaining $7,400. Candler repeated, by this time next week, the ex and possibly her boyfriend will be dead. Candler would call Fieldman in another week to instruct him where to leave the money.

Fieldman testified on his own behalf. (Doc. 2, p. 7). According to his testimony, in May 2010, Fieldman's girlfriend Talia Fonce introduced him to Bennett. (R. 275-77; Doc. 16-13, pp. 299-301). In his conversation with Bennett, she inquired about his job as a union electrician and commented that he must make good money and have good benefits. *Id.* At the time, nothing about the conversation seemed unusual. *Id.*

A few weeks later, Fieldman and Talia went to Bennett's home. (R. 278). While Fieldman and Bennett were talking on the porch, Bennett told Fieldman that she had broken into a grocery store and taken cigarettes and lottery tickets. (R. 281). Defense counsel asked Fieldman what else Bennett told him about the robbery, and the prosecution objected on the basis of relevance. *Id.* At side bar, defense counsel explained that the testimony was being offered as evidence of Fieldman's

state of mind and why he agreed to meet with Candler, not for the truth of the matter asserted. (R. 282; Doc. 16-13, p. 306). The prosecution maintained that whether Bennett burglarized a grocery store "at some undisclosed time" was not relevant. *Id.* Defense counsel responded, stating, "It absolutely is . . . . Again, our whole defense is based on what was in [Fieldman's] state of mind as to why he had to go to that meeting. This is highly relevant." *Id.* The trial court sustained the objection, stating, "It's not relevant at this point." (R. 283).

After the side bar concluded, defense counsel asked Fieldman why he agreed to meet with Candler. *Id.* Fieldman testified that he was afraid of Bennett because of the stories she had told him and because she "knew people like that." *Id.* Defense counsel then asked Fieldman what "kinds of stories" caused him to fear Bennett, and the following exchange occurred:

> FIELDMAN: When I met her before, she had told me of just the different crimes that she committed and the fact that she had told me that she had held up a guy at a house, an old man; and when he wouldn't listen and got angry that she duct taped him to a chair.
>
> MS. BOGGS [Defense Counsel]: Then what did she do to him?
>
> FIELDMAN: Proceeded to blow his brains out.
>
> MS. BOGGS: Who did she tell you was present whenever she did that?
>
> FIELDMAN: Her son.
>
> MR. LUCKMAN [Prosecutor]: Judge, this is without foundation.

(R. 284).

At this point, the trial court excused the jury. *Id.* After the jury had been excused, the prosecution argued that the line of questioning was irrelevant and without foundation. (R. 285). Defense counsel stated that she was attempting to lay the foundation and that the testimony was relevant to Fieldman's state of mind.

> MS. BOGGS: [Fieldman's] intent is one of the elements of this case, and he has a

right to explain what that intent was or was not.

        Whether or not Trina Bennett killed someone or robbed these places or anything else is not the issue. It is what she told him and what he believed as a result. How else do I get my client's mind frame in in this particular case? And it is clearly an element of the offense that he has to have the intent to have that first degree murder occur. He wants to be able to explain why he went to the meeting and why he lacks that intent, and I'm being denied his opportunity to do so.

(R. 286; Doc. 16-13, p. 310). The trial court indicated that it still failed to understand how the proposed testimony was relevant. (R. 287-89). After hearing additional argument from counsel, the Court sustained the prosecution's objection, stating as follows:

I'm sustaining the objection on relevance to this whole line of questioning. If you want to make an offer of proof, the jury is out right now. Make your offer of proof. I am not going to have the jury hearing all sorts of stuff that happened five, six, seven weeks ago that pertains to Trina Bennett that doesn't have anything to do with the [Fieldman] or the victim in this case or the meeting with Earl Candler.

(R. 291-92).

### Petitioner's Offer of Proof

Defense counsel elected to proceed with a formal offer of proof through questioning Fieldman. (R. 293-313). Fieldman testified that while he was at Bennett's house in June, she told him that she shot and killed a man after breaking into his house. (R. 294-95). Hearing this, Fieldman felt sick to his stomach and scared. Fieldman stated that as their conversation continued,

[S]he started asking me if I had ever been mad at anybody and said that, you know, she had people that she would know could take care of jobs if I had that; and I told her of course I've been mad at people but never to push it beyond that far. And she's like, well, I know you have an exwife. Have you ever wanted anything done to her. And I was like no. And that's when she was like, well, I know some people in prison and I know lots of people. I can get that job done anytime you want.

(R. 295). Fieldman told Bennett that he wanted no part of that, and he ended the conversation by walking away. Soon after, he and Talia left Bennett's house.

Over the ensuing weeks, Bennett phoned Talia several times trying to talk to Fieldman, but he did not call her back because he wanted nothing to do with her. (R. 297). According to Talia,

Bennett was calling "and bugging her about wanting, having some people coming into town and needing money," so Fieldman needed to call her. (R. 298; Doc. 16-13, p. 322).

Fieldman spoke to Bennett by phone around the 1st of July. She told him "she had people from Chicago. She had them here to do the job. She was ready to get the job done, and I needed to meet her and give her two to 300 dollars. . . . She was angry." (R. 299).

> MS. BOGGS:  And what did you tell her?
>
> FIELDMAN:  I told her no way. I said I don't know what job you are talking about. I haven't talked to you in three weeks. Why are you calling me. There's no reason for this call. And she said, well, I have these people here to do this job. You are going to pay me some money for the job. You're at least going to give me some money for the hotel room. I need a couple hundred dollars.

(R. 299). Fieldman did not meet with Bennett or her "people" or give her money.

The next day, Bennett again called Talia, who handed the phone to Fieldman. Bennett told him "she would stop over, give her a picture and the address and she would go do it for nothing." (Doc. 2-41, p. 4). Fieldman responded, "I don't want nothing done for free. I don't want no job done. I said you need to start leaving me alone. I've had enough." *Id.*

About another week later, Bennett called Talia again. Talia gave Fieldman the phone. He testified:

> She wanted to know if Shelley [Fieldman's ex-wife] was on Facebook. She wanted to, you know, she said I'll just look up information myself. If you're not going to give me any pictures and no addresses, I'll just look up the information myself. . . . [S]he didn't have my full name; and that's when I gave her the name Shan Gills.

(R. 301-02). Fieldman told Bennett, falsely, that his ex-wife's name was Stephanie Gills. He never told Bennett his real name or Shelley's maiden name. (R. 302).

Another week later, which was within 10 days of Fieldman's July 23 meeting with Candler, Bennett called Talia again. (R. 303). Fieldman heard their conversation via speakerphone. Talia

was going to have surgery the next day. Fieldman heard Bennett ask:

> Like how long we were going to be gone, where the surgery was at, what she was having surgery on, if there was going to be anybody at the house, if we were going to be gone all day, what time we were getting back. She just wanted to know every detail of what was going on.

(R. 304; Doc. 16-13, p. 328). The conversation struck Fieldman as a little odd.

The next day, Fieldman and Talia were absent from their home for the surgery from about 6:00 a.m. until about 1:00 p.m. They returned to find their dog outside, although they had left him in the house. (R. 304). Fieldman concluded that someone had been in the house, and he discovered that money had been taken. (R. 305). Fieldman had pictures of his children in the house. His attorney continued her questioning:

> MS. BOGGS:  As you thought about this incident, you thought about everything that happened up to that point, what was going through your head?

> FIELDMAN:  I was starting to get scared because not only she was trying to check on Facebook on her own, hire people on her own, now she's assuming coming into my house looking for pictures and trying to take care of this all by herself. I'm not calling her. I'm not answering any of her phone calls, not talking to her but yet she still keeps pushing and pushing . . . . [M]oney was always an issue with her which she talked about from day one . . . . I really started fearing for my family and others.

(R. 305-06).

*Arguments on Admissibility of Petitioner's Testimony*

During the offer of proof, the following interchange regarding admissibility occurred:

> THE COURT:  I'm still concerned about relevancy. There's a whole bunch of hearsay in there, everything that Trina Bennett said; and from a foundation standpoint, I still don't have a sufficient foundation. So everything that you've inquired of him up to this point I don't think is admissible.

> MS. BOGGS:  . . . [I]t's not hearsay when it's not being offered for the truth of the matter asserted.

> THE COURT:  You can say that, but that is not the effect of the testimony. You're trying to prove that Trina Bennett is the one behind all of this, and so to do that you're having Mr. Fieldman testify about what Trina Bennett supposedly said and

did because you said she's the choreographer of all of this. So if you are going to point the finger at Trina Bennett, then you're going to have to have somebody besides Trina Bennett's out of court statements used to prove that.

MS. BOGGS: We have her going to the police and orchestrating this. That's already come in . . . . And we have tapes of her calling.

THE COURT: Right. But I'm not going to let hearsay come in through him of Trina Bennett. You can call her to testify, but I'm not letting hearsay come in. It's hearsay.

(R. 307-08; Doc. 16-13, pp. 331-32).

[Discussion was had regarding Trina Bennett's availability to testify that day. The prosecutor later reported that she was in the courthouse and available. (R. 322; Doc. 16-13, p. 346).]

THE COURT: If there's anything else on the offer of proof, this stuff is completely irrelevant number one; and number two, it's all full of hearsay; and I disagree with you. What you are trying to prove is that this Trina Bennett was a really bad person, and you are trying to prove it with words that she said out of court.

MS. BOGGS: No, Your Honor. I am trying to prove that he believed she was a really bad person because of what she told him. It's not for whether or not she did the robbery in Piper City or whether she did this murder. It's based on what she told him, what she set in his mind that prompted his activities.

THE COURT: Mr. Luckman?

MR. LUCKMAN: Judge, it's apparently being argued that way. But again, I suggest that it is a not very thinly veiled attempt to dump it on somebody else's door. Whether you want to call it a nondisclosed compulsion defense, whether you want to call it an entrapment defense because there's no government activity. It's nothing but sullying someone who didn't even testify. It is way outside this asserted posture of trying to explain, strange though it sounds explain some thought process of the Defendant in meeting with Sergeant Candler.

THE COURT: All right. I'm sustaining the objection.

(R. 308-09).

* * *

MS. BOGGS: I sit here and I've been told that I haven't laid foundation. I have explained the dates of the conversations as closely as we can produce them, how they occurred, whom they occurred with, how he identified the voice. I don't know

what foundational elements are missing here.

Secondly, I seem to be . . . an understanding of hearsay that you guys apparently don't like; but that is the law on hearsay. I'm not offering any of this for the truth that these events occurred but that she said them to him to put it in his mind because we all know Trina Bennett set this up. So how is the jury to understand why he has a conversation with Trina Bennett that leads – You know, how else would he explain why he went to her, why he did what he did, why he went to the police?

You know, you are taking the entire defense away because you don't like what is coming in; but it is legally admissible.

THE COURT: It doesn't have to do with not liking it. It has to do with it's not a proper way to bring that evidence in, and you have absolutely nothing to corroborate it so it's not reliable evidence. It is hearsay evidence, and it's not appropriate.

. . . I am not going to allow the jury to hear evidence that is not relevant, that is hearsay . . . . I find as the Judge in this case that it is hearsay; and it is extremely inflammatory. There is absolutely nothing to corroborate it with. You are just bringing in a bunch of stuff.

Mr. Luckman has alluded to you are skipping around compulsion, . . . and you are throwing it all in through the testimony of your client. That is not following the proper rules of evidence, the proper disclosures. It is not relevant at this point. It is not admissible at this point. It is not coming in . . . .

MS. BOGGS: Well, for the record, I stand on my position. I think that the Court's ruling is incorrect. I believe that there is none of this being offered for the truth of the matter asserted. That my client's mind set is absolutely relevant in this case. His state of mind in explaining what he does and why he does it and when he does it is clearly admissible, and there is no other way for that to happen except for conversations he had with Trina Bennett because Trina Bennett is the one who comes to the police clearly establishing evidence that he and her must have spoken.

THE COURT: If you want to talk about his state of mind on the day of the incident, go right ahead. But I'm not talking about his state of mind because he went over there a month and a half ago . . . . It's not relevant . . . . And also you're going to have him testifying that Trina Bennett apparently he thinks broke into his house. There's absolutely nothing to substantiate that.

MS. BOGGS: Again, it's what he thinks that's relevant.

THE COURT: That might be what you think is relevant.

MS. BOGGS: That's what circumstantial evidence is all about. That's what the whole sequence of events is about.

THE COURT: And it has absolutely nothing to do with whether or not he intended

Earl Candler to kill his wife when he had these conversations with her. You are trying to prove one thing, but you are going about it not in accordance with the rules of evidence.

       If you want him to testify in front of the jury that on the day that this happened he felt that he was being pushed by Trina Bennett, he felt uncomfortable, he was concerned because he didn't know what she was going to do, fine. He can testify to all of that on that day. He is not going to testify to everything that ever happened the two months prior to that that are not relevant, that are full of hearsay and lack any proper foundation for how he would know any of this stuff. It's hearsay.

(R. 309-12; Doc. 16-13, pp. 333-36).

Fieldman's counsel continued with the offer of proof. Fieldman stated that on July 22 (the day before the meeting with Candler) Bennett had called again, this time directly to his phone. (R. 306). Fieldman was concerned about what would take place based on his interactions with Bennett over the previous four to five weeks. Despite telling Bennett that he would meet with the "hit man," Fieldman did not intend to go through with the meeting. (R. 313). At 5:50 p.m. on July 23, Bennett called him again. (R. 313-14). Later that evening, he changed his mind about meeting with Bennett and her contact:

    I knew that Trina had called and wanted me to meet there around 7 from what I talked to her; but I had no plans on meeting; but I also knew that if I was ever going to get her off my back and get it done that was the perfect timing because no one was home. I knew the kids were on vacation; and no matter what happened I could meet with someone, get some evidence, and then go to the police myself.

(R. 315).

Counsel then questioned Fieldman about his meeting with the "hit man." (R. 316-17). He believed he was in the truck with a killer and knew that if he tried to back out, the "wheels are already set in motion," and he feared for his family's safety and his own. (R. 317). When he left the meeting in the Walmart parking lot, Fieldman did not immediately go to the police because Talia asked him to take her boys home while she stayed at her ailing grandfather's house. Because Shelley and their children were out of town for the weekend, nothing could be done to them yet.

He planned to take the boys home and go to the police the next morning. But he was pulled over and arrested while he was on the way home. (R. 317-19).

***Trial Court's Evidentiary Ruling***

After the conclusion of the offer of proof, the Court "continue[d] to sustain the State's objection to the evidence on relevance, hearsay, and to some extent foundation on some of the . . . matters that were testified to by the Defendant." (R. 319; Doc. 16-13, p. 343). After a recess, the Court continued:

> [J]ust so the record is clear . . . I think there are two things that are getting intertwined. There is a defense that he did not ever intend for the Sergeant Candler to kill Shelley Fieldman, and then there's also intermingled with that you are trying to say that he was scared and felt basically, well, I would say bordering on a compulsion defense. That there was some impending . . . when he considered all of this evidence that you wanted to bring in, he felt he had no other choice. That's compulsion.
>
> And the compulsion evidence first of all it wasn't disclosed. It's not relevant. You could have testimony that . . . Trina Bennett killed 10 people; and it's not going to matter at this point; and it's not going to be relevant unless you are going to be able to somehow tie that up; and the offer of proof did not t ie that up.
>
> It is fair game if you want to talk about his intent; and that is an element of the offense whether he intended to have Shelley killed that day; and he can certainly testify that he did not intend to have Shelley killed that day. That he intended to do this. That he intended to go to the police. But he can't offer a compulsion offense [sic] to skirt around it and admit prior bad acts of somebody who has not testified that are not otherwise tied up and that are hearsay.
>
> So I want to be clear that he can testify about what, you know, you are mixing up state of mind with whether he intended to kill her; and that's not proper. But if he wants to testify I did not intend to have her killed that day, he can testify to that. You're not going to get evidence in that Trina Bennett did all of these prior bad acts or anything else that is around the issue of compulsion because I think that's kind of what you are coming around to; and it's not relevant nor is it proper rules of evidence.
>
> So that clarifies my ruling, but I'm not prohibiting him from testifying that he did not intend for her to be killed. You're arguing state of mind, and it's a little bit different. It's apples and oranges. So I want it to be clear that he can testify on those points, but he is not going to testify to the hearsay and irrelevant information concerning Trina Bennett's alleged prior history.

(R. 320-21).

*Petitioner's Remaining Testimony*

The jury was brought back in, and Fieldman's testimony resumed. (R. 323; Doc. 6-13, p. 347). He was able to testify that after having a conversation with Bennett at her house in mid-June, he became concerned, ended the conversation, and never wanted to see Bennett again. (R. 323-24). About two weeks later, he spoke to Bennett by phone; he was not allowed to testify further about that phone conversation. (R. 325). In another conversation about two weeks before the July 23rd meeting, he gave Trina Bennett a false name (Stephanie Gills) for his wife, and never told Bennett her real surname or his own. (R. 326).

Bennett left voicemail messages on Fieldman's phone on July 22, but Fieldman did not call her back and did not want to talk to her. (R. 328-29). He ultimately spoke to Bennett by phone on July 23 after his girlfriend answered the phone and handed it to him. (R. 329-30). He told Bennett he would meet her that night, but he never intended to go. *Id.* He had a second conversation with Bennett at about 5:50 p.m. on July 23, where again he told her he would meet, with no intention of going. (R. 330).

Later that evening, after Fieldman's plans to go home were put on hold so Talia could visit her terminally-ill grandfather, he reconsidered and decided to meet Bennett and the hit man: "I knew that Shelley and Alan and the kids were going to be gone; that, you know, I was ready to have this all done and over with." (R. 331). "I was tired of being called and more and more phone calls and badgered by Trina Bennett." (R. 332). He thought that having this meeting would end it. *Id.*

> MS. BOGGS: When you went to this meeting, was it your intention to hire someone to kill Shelley Fieldman or Alan Chrossfield?
>
> FIELDMAN: No.
>
> MS. BOGGS: When you got into the meeting, what was the first thing that

happened?

FIELDMAN: We got in there; and he offered me a beer; and I didn't want one; and then he, you know, he asked me about if I wanted something done to my exwife; and then he said that, you know, he had a wife that had an unfortunate accident.

MS. BOGGS: What was your reaction to that?

FIELDMAN: I was scared. I knew then that I was in the truck with a killer.

MS. BOGGS: Did you think you were in over your head?

FIELDMAN: Yes. Very much so.

MS. BOGGS: Why?

FIELDMAN: Because I'm on my own. I winged it. I hadn't really planned anything out. Just the time struck as right with them being gone and me being in Pontiac, and it was just time to get it over with.

MS. BOGGS: And is that why you appeared at that meeting?

FIELDMAN: Yes.

MS. BOGGS: In the few minutes, how long did you decide ahead of time that you were going to have this meeting?

FIELDMAN: Probably five, 10 minutes before.

MS. BOGGS: And in that five, 10 minutes beforehand when you are thinking about this and thinking about going through with the meeting, what was going through your head? What were with [sic] you going to do?

FIELDMAN: I knew I was going to try to go get some information and go to the police.

(R. 332-33; Doc. 16-13, pp. 356-57).

Fieldman added that he planned to report his information to the Dwight Police Department (rather than Pontiac) because he had two friends who worked there. (R. 334). He knew that he had to continue with the meeting and "try to get something set up because he knows Miss Bennett. She knows where I live; therefore, he was going to know where I live and all my information, all their

15

information." (R. 335; Doc. 16-13, p. 359).

Fieldman explained that in his conversation with the "hit man" (Candler), he wrote down the location of Shelley's house and described it, so that he "would have information to tell [the police] so they could identify him," and "[b]ecause if he's going to show up and the cops are going to be ready there for him, I want to make sure that he goes to the right house." (R. 336-37). Fieldman did not tell Candler that Shelley's house is a half block away from the Dwight Police Department. While Fieldman had told Candler that Shelley and Alan often hung out in their garage, and that the garage faced a dark alley, he had no idea if this was true. (R. 337).

Fieldman paid Candler $100 and promised to pay him $7,400 more, but he did not have access to $7,400 and had no intention to get the money in the next two weeks as agreed. (R. 338). He planned to go to the police after leaving Candler, but after Talia asked him to drive her boys home, he decided he would go to the police the following morning since Shelley and Chrossfield were out of town. He had no intention to have Shelly Fieldman or Alan Chrossfield killed, and he had no reason to want them killed. (R. 338-40).

### 3.     Appeal and Postconviction Petition

Fieldman raised a number of challenges to his conviction in his *pro se* direct appeal. (Doc. 1, pp. 2-3; Doc. 1-1; Doc. 16-2); *People v. Fieldman*, 2013 IL App. (4th) 111065-U. As relevant here, he argued that the trial court's exclusion of his testimony on his conversations with Trina Bennett and the effect on his mental state of those interactions denied him his constitutional right to present a defense, in violation of the Fourteenth Amendment's Due Process Clause. Doc. 1, p. 3; Doc. 1-1, pp. 4-5; Doc. 16-2, pp. 8, 54-58; Doc. 16-4, pp. 10, 27-28).

The Illinois Appellate Court did not reach the constitutional issue. Instead, it concluded that the trial court did not abuse its discretion in determining that the evidence was not relevant

and therefore inadmissible. (Doc. 1-1, pp. 4-5; Doc. 16-1, pp. 7-9). The court affirmed Fieldman's

conviction on December 11, 2013. He filed a *pro se* Petition for Leave to Appeal ("PLA") to the

Illinois Supreme Court, again raising the claim that he was unconstitutionally deprived of the right

to present a defense. (Doc. 16-6, pp. 53-55). The PLA was denied on September 24, 2014. (Doc. 1,

p. 4; Doc. 16-5).

On March 14, 2014, Fieldman filed a *pro se* post-conviction motion to vacate his

convictions pursuant to 735 ILCS 5/2-1401, challenging the court's jurisdiction because he did not

enter a plea to the amended information. (Doc. 1, p. 6; Doc. 16-7, p. 2). That motion was denied

by the trial court on September 12, 2014. (Doc. 1, p. 6). His appeal from that order was denied on

September 22, 2015. (Doc. 16-7).

LAW APPLICABLE TO SECTION 2254 PETITION

**1.      Substantive Law**

This habeas petition is subject to the provisions of the Antiterrorism and Effective Death

Penalty Act, known as the AEDPA. "The Antiterrorism and Effective Death Penalty Act of 1996

modified a federal habeas court's role in reviewing state prisoner applications in order to prevent

federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent

possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Habeas is *not* merely another round of appellate review. 28 U.S.C. § 2254(d) restricts

habeas relief to cases where the state court determination "resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established federal law, as determined by

the Supreme Court of the United States" or "a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."

A judgment is "contrary to" Supreme Court precedent if the state court "contradicts the governing

law set forth in [Supreme Court] cases." *Coleman v. Hardy*, 690 F.3d 811, 814 (7th Cir. 2012) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application of" clearly established law "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Coleman*, 690 F.3d at 814 (quoting *Williams*, 529 U.S. at 407).

Federal habeas review serves as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring)). The Supreme Court has emphasized that the Section 2254(d) standard "is intentionally 'difficult to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014), and *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)).

Even an incorrect or erroneous application of the federal precedent will not justify habeas relief; rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "A state court's decision is reasonable, even if incorrect in our independent judgment, so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.'" *McDaniel v. Polley*, 847 F.3d 887, 893 (7th Cir. 2017) (internal citations omitted). For habeas relief to be granted, the state court's application of federal precedent must have been "objectively unreasonable," meaning "something like lying well outside the boundaries of permissible differences of opinion." *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003). (internal citations omitted).

**2.      Timeliness, Exhaustion and Procedural Default**

In addition to the requirement for timely filing under the AEDPA, a habeas petitioner must clear two procedural hurdles before the Court may reach the merits of his habeas corpus petition: exhaustion of remedies and procedural default. *Bolton v. Akpore*, 730 F.3d 685, 694-696 (7th Cir. 2013). Before seeking habeas relief, a petitioner is required to bring his claims through "one complete round of the State's established appellate review process" because "the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also* 28 U.S.C. § 2254(c). Under the Illinois two-tiered appeals process, petitioners must fully present their claims not only to an intermediate appellate court, but also to the Illinois Supreme Court, which offers discretionary review in cases such as this one. *Id.*

Respondent concedes that Fieldman has exhausted his state court remedies. (Doc. 15, p. 4). She does not contest Fieldman's assertion that the habeas petition was timely filed, and she does not claim that Fieldman's ground for relief is procedurally defaulted. Respondent argues, however, that the petition must be denied because an alleged error in a trial court's evidentiary ruling on relevance cannot be a basis for federal habeas relief, and the court's exclusion of the proffered testimony as irrelevant was reasonable. (Doc. 15, pp. 5-6). Fieldman counters that his due process claim is cognizable under 28 U.S.C. § 2254. (Doc. 20).

### ANALYSIS

On habeas review, the federal court assesses the decision of the last state court to consider the issues raised in the habeas petition. *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 1192 (2018); *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006). Here, that is the decision of the Illinois

Appellate Court, Fourth District, affirming Fieldman's conviction on direct appeal. (Doc. 16-1).

Fieldman frames the issue as a denial of his federal constitutional right to present a defense. Respondent, in contrast, analyzes the matter solely as an evidentiary ruling based on state law. Indeed, the state appellate court reviewed this claim as set forth by Respondent, focusing on the admissibility of Fieldman's proffered testimony regarding his conversations with Trina Bennett in the weeks leading up to his meeting with the supposed hit man. The appellate court concluded that the trial court did not abuse its discretion in excluding this evidence on relevance grounds.[3] The state court's opinion contained no discussion of Fieldman's federal claim that the trial court's ruling unconstitutionally curtailed his right to present a defense on the issue of his intent.

Fieldman fairly presented the federal constitutional issue to the trial and appellate courts, as well as in his rejected PLA to the Illinois Supreme Court. *See Baldwin v. Reese*, 541 U.S. 27, 32, (2004) (litigant can indicate the federal basis for his claim by citing federal source of law or by labeling the claim "federal"). His trial attorney countered the state's objection and the court's decision to prohibit Fieldman from testifying to the content of his conversations with Trina Bennett, arguing that the exclusion prevented Fieldman from presenting a defense on the critical issue of his intent. She alerted the trial court to the constitutional implications of its ruling at the time Fieldman's offer of proof was made and rejected, and counsel raised the issue again in a post-trial motion. (Doc. 2-10). Fieldman chose to pursue his direct appeal *pro se.* He raised the denial of his Sixth Amendment right to present a defense before the Illinois Appellate Court, invoking several Supreme Court cases. (Doc. 16-2, pp. 8, 54-58). Nonetheless, the appellate court made no

---

[3] Notably, the trial court explained that Fieldman's testimony was being excluded based on "relevance, hearsay, and to some extent foundation[.]" (R. 319; Doc. 16-13, p. 343). The appellate court did not discuss the hearsay or foundation aspects of the trial court's ruling.

mention of the federal constitutional aspect of the trial court's exclusion of Fieldman's proffered testimony.

As relevant here, Section 2254(d) requires the federal court to determine whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." If the issue at hand merely involved a question of the admissibility of evidence under state rules, then Respondent would be correct that federal habeas relief is unavailable. But the state appellate court (and trial court) utterly failed to acknowledge, consider, or apply key Supreme Court precedent directing that a defendant's right to present a defense must prevail over state evidentiary rules in some circumstances. As such, the appellate court's decision was either contrary to, or an unreasonable application of clearly established federal law.

Longstanding Supreme Court precedent clearly establishes a criminal defendant's right to present a defense. "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'. . . We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984), and citing *In re Oliver*, 333 U.S. 257, 273 (1948)). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). *See also Washington v. Texas*, 388 U.S. 14, 19 (1967) ("the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies . . . . is a fundamental element of due process of law"). These cases illustrate that state evidentiary rules must sometimes yield to ensure a defendant's right to meaningfully test the State's case against him.

In *Chambers v. Mississippi*, the defendant was denied a fair trial because the state "voucher" rule prohibited him from cross-examining his own witness (who had earlier confessed to the murder Chambers was on trial for), and because the testimony of three people to whom the witness had confessed was ruled inadmissible as hearsay. Finding that the excluded testimony was critical to Chambers's defense, the Supreme Court held that the application of the "voucher" rule in his case, together with the "mechanistic" application of the hearsay rule, deprived him of a fair trial. *Chambers*, 410 U.S. at 298-302.

In *Crane v. Kentucky*, the defendant sought to testify about the circumstances of the interrogation that led to his confession to murder. Before trial, he moved to suppress the confession, on the basis that he was 16 years old at the time, had been detained in a windowless room for a lengthy period, was surrounded by up to six police officers, was repeatedly denied permission to telephone his mother, and was badgered into falsely confessing. The court ruled the confession to be voluntary and admissible, and then prohibited the defendant from attacking its credibility with trial testimony about the length and nature of the interrogation. Even though evidence regarding the credibility of a confession would have been admissible, the trial court reasoned that the excluded testimony "related solely to voluntariness" of the confession, which could not be relitigated at trial. *Crane*, 476 U.S. at 686-87. The Supreme Court held that the trial court's evidentiary ruling deprived Crane of "his fundamental constitutional right to a fair opportunity to present a defense." *Id.* at 687 (citing *California v. Trombetta*, 467 U.S. at 485). The Court observed that without the ability to tell the jury about the "circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" *Crane*, 476 U.S. at 689.

The Court recognized that trial courts have "wide latitude to exclude evidence that is repetitive . . . only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." *Crane*, 476 U.S. at 689-90 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (internal quotation marks omitted). States may also "exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability[.]" *Crane*, 476 U.S. at 690. But a state's latitude to establish rules excluding evidence from criminal trials "has limits." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).

Returning to *Crane v. Kentucky*, the Court observed that the defendant's "entire defense" was that his "earlier admission of guilt was not to be believed," and "introducing evidence of the physical circumstances that yielded the confession was all but indispensable to any chance of its succeeding." *Id.* at 691.

In this case, Fieldman argues persuasively that the State's key evidence against him—the video-audio recording of his meeting with Candler in which they made arrangements for Candler to kill Shelley and possibly her boyfriend—was tantamount to a recorded confession. Indeed, it is hard to imagine any evidence that could be more incriminating than the videotape.[4] The crucial question for the jury to decide was whether Fieldman actually intended to have the murders carried out—an element of the offense of solicitation of murder for hire, which must be proven beyond a reasonable doubt. Fieldman's only defense was that he never had this intent, and instead, his statements to Candler were a charade.

The trial court prevented Fieldman from describing the sequence of his escalating interactions with Bennett leading up to the meeting that she arranged. The jury had to weigh Fieldman's credibility as to the element of his intent without this context, which would have

---

[4] At Fieldman's sentencing, the trial court commented that the video recording "stands out more than any other" evidence, and "chilling is really an understatement." (R. 443; Doc. 16-13, p. 465).

explained how he came to fear that Bennett would harm him or his family and what was going through his mind when he decided to go ahead with the meeting. After the trial court excluded Fieldman's offer of proof, he was merely allowed to testify that he had no intent to have anybody killed, and decided to meet with Candler and then go to the police because he feared and felt pressured by Trina Bennett. In the face of the videotape, the jury had little reason to believe Fieldman's testimony without hearing the full background, which would have explained his state of mind during the meeting with Candler and lent credibility to his defense of lack of intent. The comparison with *Crane v. Kentucky*—where the defendant's own proffered testimony to challenge the credibility of his confession was severely curtailed—is apt.

Contrary to the Respondent's characterization that the trial court excluded "one particular piece of testimony" on the basis of relevance (Doc. 15, pp. 9, 15), Fieldman was barred from testifying about the majority of his interactions with Bennett, during which she made repeated attempts to engage him in arranging for his ex-wife's murder, in spite of his refusal. His offer of proof included the following matters, none of which the jury was allowed to hear: Soon after Fieldman met Bennett, she told him of her criminal conduct, including a murder, then said that if he was mad at anybody she knew people who could "take care" of that—specifically mentioning his ex-wife; over the next couple weeks Bennett persisted in leaving phone messages for Fieldman which he ignored; when he called her back at his girlfriend's prompting about three weeks before the meeting, Bennett angrily demanded money for people who had come to town to "do the job" but he refused; Bennett offered the next day to kill Fieldman's ex-wife herself, whereupon Fieldman told her he didn't want any "job" done and to leave him alone; a week later Bennett said she would find Shelley's picture on Facebook herself; Bennett knew where Fieldman lived and he believed that she broke into his house and stole money; and as a result of this sequence of events,

Fieldman feared for himself and his family. (R. 293-313; Doc. 16-13, pp. 317-37). Had Fieldman been allowed to relate this background, the jury could have considered this context in deliberating over Fieldman's mental state during his meeting with Candler regarding whether or not he intended to engineer the murders. As it was, Fieldman was not permitted to explain his statement that he was "badgered" by Bennett (R. 332; Doc. 16-13, p. 356) or explain why he decided to meet with Candler in an effort to stop her.

The Seventh Circuit has distilled the Supreme Court's rulings in *Chambers* and its progeny into several key factors for courts to weigh in resolving the conflict between state evidence rules and a defendant's constitutional right to present a defense. *Kubsch v. Neal*, 838 F.3d 845, 858 (7th Cir. 2016); *see also Johnson v. Chrans*, 844 F.2d 482, 484 (7th Cir. 1988) ("The strength of defendant's argument that state rules of evidence, rather than the defendant's right to present exculpatory evidence, should give ground depend largely on the importance of the evidence."). Notably, neither the trial court nor the appellate court in Fieldman's case engaged in any balancing of the importance to the defense of Fieldman's proffered evidence against the evidentiary rules. The *Kubsch* court first noted that "the cases in which the *Chambers* principle has prevailed 'dealt with the *exclusion* of evidence . . . or the testimony of defense witnesses'" as opposed to "'a defendant's ability to present an affirmative defense.'" *Kubsch*, 838 F.3d at 858 (quoting *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993) and adding emphasis). Second, it noted that all the cases where the Court had applied *Chambers* involved murder and often the death penalty. *Id.* Third, "the proffered evidence must be essential to the defendant's ability to present a defense; it cannot be cumulative, impeaching, unfairly prejudicial, or potentially misleading." *Id.* Fourth, the evidence must be reliable and trustworthy, and finally, the rule that would exclude the evidence "cannot operate in an arbitrary manner in the case at hand." *Id.*

Applying these factors here, the importance of Fieldman's excluded evidence, which would have explained to the jury why he decided to meet with a hit man to ostensibly arrange a murder when he never intended for the crime to be carried out, cannot be overstated. Without the background of his interactions with Bennett, Fieldman's defense was reduced to a bare-bones denial that he had the requisite intent, without any context to explain his actions. As with *Chambers*, *Crane*, and others in this line of cases, Fieldman's case involves the exclusion of evidence, specifically his own testimony; there was no issue of his ability to present an affirmative defense.[5] The *Kubsch* court next noted that the *Chambers* principle has been applied in murder cases. The offense of solicitation of murder for hire in this case is of a comparable degree of seriousness to a completed murder; both offenses carry a minimum sentence of 20 years in Illinois.[6] As to the third factor, the proffered evidence in this case was essential to Fieldman's ability to present his defense of lack of murderous intent, and the evidence was not cumulative, impeaching, unfairly prejudicial, or potentially misleading. To the extent that the trial court was concerned about Fieldman's testimony painting Bennett as a "bad person," it was established that Bennett herself was present and available to testify in order to address Fieldman's account of their conversations, had he been permitted to testify about them. Bennett's appearance as a witness could have countered any potential prejudice or confusion arising from Fieldman's testimony. The reliability and trustworthiness of Fieldman's proffered testimony would have been up to the jury

---

[5] The State, and to some extent the trial court, characterized Fieldman's proffered testimony in part as an improper attempt to introduce the affirmative defense of compulsion. (R. 291, 309, 320-21, 328, 335-36). But Fieldman clearly disavowed such an affirmative defense, noting that it would have required him to *admit* that he committed the crime of solicitation of murder for hire in order to raise a compulsion defense. Instead, he maintained his innocence, focusing on the absence of his intent to have the murders carried out.
[6] First degree murder carries a penalty of 20-60 years (730 ILCS 5/5-4.5-20(a)) and solicitation of murder for hire, a class X felony, has a penalty of 20-40 years (720 ILCS 5/8-1.2(b)). The standard sentencing range for other class X felonies is 6-30 years. 730 ILCS 5/5-4.5-25(a).

to determine, as with any other witness.[7]

The final factor outlined in *Kubsch* is that the rule excluding the evidence cannot operate in an arbitrary manner. The trial court cited relevance, hearsay, and to some extent, foundation as the reasons for excluding Fieldman's testimony about his conversations and interactions with Bennett during the approximately 4-5 weeks prior to his meeting with Candler. The appellate court addressed only the relevance aspect. The trial court focused on the time frame of Bennett's interactions with Fieldman, insisting that the events that occurred even as little as ten days before the meeting on July 23, 2010, could not be relevant to Fieldman's intent on the evening when he met with Candler. Fieldman was permitted only to talk about his intent and the events on the day of that meeting. This narrow view amounted to an arbitrary cutoff as to relevancy, without any consideration of the content of the excluded information, let alone the importance of the testimony to Fieldman's ability to mount a defense. The court's exclusion of Fieldman's proffered testimony regarding his intent was a "refusal to consider corroborating circumstances," which the *Kubsch* court recognized as one of several ways to satisfy the criterion of arbitrariness. *Kubsch*, 838 F.3d at 858.

Ultimately, the undersigned finds, as the Seventh Circuit did in *Kubsch*, that "the jury should have been given the chance to evaluate this case based on *all* the evidence, rather than on the basis of a truncated record that omitted the strongest evidence the defense had." *Kubsch*, 838 F.3d at 861. Without the excluded testimony, Fieldman was disabled from explaining why the jury should not have taken the incriminating videotape at face value. His description of the chain of

---

[7] Likewise, as to the trial court's conclusion that Fieldman's testimony about his conversations with Bennett was hearsay, Fieldman's counsel clearly stated that her purpose in seeking to have Fieldman testify about them was to show the effect Bennett's statements and actions had on his mental state and his intent, not to prove the truth of Bennett's out-of-court statements. As such, Fieldman's testimony was not hearsay—and again, Bennett was available to testify.

events that prompted his actions on July 23, 2010, would have lent credibility to his claim that he never intended for the murders to occur. This case falls within the "narrow set of circumstances" where due process demands that evidence rules must yield. *See Kubsch*, 838 F.3d at 862 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)). The state courts' failure to apply the due process principles set forth in *Chambers*, *Crane*, and *Holmes* was either contrary to, or an unreasonable application of, this well-established Supreme Court precedent. Fieldman has satisfied the standards for relief under 28 U.S.C. § 2254(d).

CONCLUSION

The Clerk is **DIRECTED** to substitute the Warden of Hill Correctional Center as the Respondent in this action, and terminate Kim Butler, pursuant to Fieldman's custody information provided on the Illinois Department of Corrections Inmate Search Page, https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (last visited March 25, 2019).

For the reasons explained above, the petition for a writ of habeas corpus (Doc. 1) is **GRANTED**. Respondent shall release Fieldman unless the State of Illinois initiates proceedings to retry him within **60 days** of the date of this order.

The Clerk of Court shall enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED:  March 27, 2019**

**NANCY J. ROSENSTENGEL**
**United States District Judge**